IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,254


JASON UNRUH,
*Appellant*,


v.


CITY OF WICHITA, ET AL.,
*Appellees.*



SYLLABUS BY THE COURT


1.

Civil battery and negligence are discrete concepts in tort with different elements of proof.


2.

Civil battery is the unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or an apprehension of contact that is harmful or offensive. Intent to inflict such contact or apprehension of such contact is a necessary element for the intentional tort of battery.


3.

A negligence claim requires a plaintiff to prove:  (a) the defendant owed plaintiff a legally recognized duty; (b) the defendant breached that duty; (c) the defendant's breach caused plaintiff's injuries; and (d) plaintiff suffered damages. None of these concerns the defendant's mental state.

4.

Substance prevails over form when determining the applicable statute of limitations. A party's labeling of a claim in a civil petition as an action in negligence does not alter the character of that claim when deciding the applicable limitations period. A court must look to the particular facts and circumstances to properly characterize the cause of action.

5.

A negligence claim alleging excessive use of force by a police officer requires the plaintiff to show the officer owed that plaintiff a legally recognized duty of care that arose independent of the force the plaintiff alleges to be excessive. A court must be able to analyze the distinct elements of negligence separately from the distinct elements of battery and its associated defense of privilege.

6.

Language in *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 1033, 667 P.2d 380 (1983), suggesting a police officer owes a special duty anytime "there is an affirmative act by the officer causing injury" is disapproved.

Review of the judgment of the Court of Appeals in an unpublished opinion filed July 1, 2022. Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Oral argument held March 28, 2023. Opinion filed January 5, 2024. Judgment of the Court of Appeals affirming the district court is affirmed on the issue subject to review. Judgment of the district court is affirmed on the issue subject to review.

*Michael T. Jilka*, of Graves & Jilka, P.C., of Lawrence, argued the cause and was on the briefs for appellant.

*David R. Cooper*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, argued the cause, and *Sharon L. Dickgrafe*, chief deputy city attorney, and *Jennifer L. Magana*, city attorney, were with him on the briefs for appellee.

The opinion of the court was delivered by

BILES, J.: Wichita police forcefully apprehended Jason Unruh after he led them on a nighttime car chase down city streets in a pouring rain. The pursuit ended when his vehicle spun out of control, hopped a curb, and came to rest over a sidewalk. He pulled himself out through the driver's side window holding a bag of methamphetamine and tumbled to the ground. He ignored commands to stop, and officers subdued him as he scooped up drugs that spilled onto the wet pavement. About 23 months later, Unruh sued for personal injuries, claiming officers negligently used excessive force to arrest him. The issue is whether his claim is for common-law civil battery, rather than common-law negligence as he alleges.

Unruh contends the officers misperceived the threat he presented at the scene but agrees they intentionally used force while making a lawful felony arrest. The district court granted defendants summary judgment after construing this claim as an allegation of civil battery. This means the one-year statute of limitations for battery bars Unruh's lawsuit. See K.S.A. 60-514(b). He appealed that ruling, but a Court of Appeals panel agreed with the district court. *Unruh v. City of Wichita*, No. 124,254, 2022 WL 2392657, at *8 (Kan. App. 2022) (unpublished opinion). On review, we affirm.

Civil battery and negligence are discrete concepts with different elements of proof. The law defines civil battery as the unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or an apprehension of contact that is harmful or offensive. *McElhaney v. Thomas*, 307 Kan. 45, 53, 405 P.3d 1214 (2017). In contrast, negligence requires proof that: (1) the defendant owed plaintiff a legally recognized duty; (2) the defendant breached that duty; (3) the defendant's breach

3

of duty caused plaintiff's injuries; and (4) plaintiff suffered damages. *Reardon v. King*, 310 Kan. 897, 903, 452 P.3d 849 (2019). Intent is not an element when deciding whether a breach of a legal duty occurred. Labeling a claim in a pleading as an action in negligence does not alter its character when deciding the applicable limitations period.

Here, Unruh asserts the officers misunderstood how dangerous he may have been, which in turn, allegedly caused them to use more force than necessary to make his arrest. But he fails to come forward with evidence establishing the officers owed him a legally recognized duty of care that arose independent of the force he alleges to be excessive. Unruh states only a civil battery claim.

Granted, a discrete negligent act *might* arise during an incident involving excessive police force, when the elements of the negligence claim can be separately and distinctly analyzed apart from the elements of common-law battery. See *Unruh,* 2022 WL 2392657, at *8 ("[W]e do not discern any negligent act which was separate from and preceding the application of force, and Unruh does not assert that the officers breached a standard of care beyond that of not using excessive force."). But without something more, Unruh's dispute over the degree of nonlethal force applied when officers made a felony arrest simply invokes civil battery's privilege element, which is tied to a statute in this instance. K.S.A. 2022 Supp. 21-5227(a) declares a police officer is justified in using any force, short of deadly force, the officer reasonably believes necessary to effect an arrest or defend oneself or another officer from bodily harm while making an arrest.

The arresting officers may have committed civil battery if they used more force than is statutorily privileged to make a lawful arrest. But to pursue that question, Unruh should have filed suit within 12 months of the contested application of force. See K.S.A.

4

60-514(b). Substance prevails over form when a court decides a limitations period. The district court and panel properly concluded Unruh's cause of action was for battery.

FACTUAL AND PROCEDURAL BACKGROUND

Wichita police attempted a traffic stop as Unruh drove down city streets in a rainstorm. He did not stop when police activated their overhead lights. He ran a red light and tried to elude police. Multiple police cars gave chase. Dispatch advised the pursuing officers that Unruh was known to be a drug dealer and at times armed. His car ran through other red lights and on occasion crossed the center line. He lost control of his vehicle twice. The first time, the car spun out on the wet pavement and struck a tree broadside smashing the driver's side door. Unruh ignored officers' commands to "show your hands" and "put your hands up" and drove away. Resuming the chase, officers saw Unruh throwing handfuls of what appeared to be methamphetamine out the driver's side window.

Several minutes later, Unruh's car spun out again. This time, he drove over another curb and came to a stop straddling a public sidewalk edged by commercial landscaping. He climbed out the driver's side window holding a bag of methamphetamine and fell to the ground—again ignoring officers' commands to stop and put up his hands. Officer Daniel Weidner testified when he approached, he noticed Unruh on the ground, holding something as he reached under the car. This caused Weidner to fear Unruh might have a gun. Unruh now says he was only trying to gather up the drugs that spilled onto the wet sidewalk.

Weidner's police dog attacked Unruh as the officers arrived, although it is unclear whether Weidner directed the dog to do so. At any rate, Weidner commanded the canine

5

to stop and took control of his collar before Unruh could be handcuffed. Unruh claims Weidner kicked him in the shoulder and in the head as other officers tried to subdue him. Unruh also alleges Officer Brett Pearce punched him in the face and struck him in the back as officers rolled him face down to be handcuffed. The entire incident took about 30 seconds from when Unruh's car finally stopped until he was handcuffed.

A search of Unruh's vehicle found drugs, a digital scale, and $19,178 cash. Unruh was charged in federal court with possession with intent to distribute methamphetamine. He pled guilty to that charge.

Unruh later sued Weidner, Pearce, Wichita Police Chief Gordon Ramsay, and the City of Wichita for personal injuries. Among his claims, Unruh alleged Weidner and Pearce negligently used excessive force without a reasonable objective basis to believe he posed a threat of serious physical injury or death to them or others. He also claimed the officers violated the department's use-of-force policies and procedures. The defendants moved to dismiss, arguing the one-year statute of limitations for civil battery barred his claims because he waited to file his lawsuit until nearly 23 months after the incident. The district court denied the motion, stating "at this stage in the proceedings" the petition asserted valid claims for relief. The court noted Unruh alleged the officers violated "specific WPD regulations and norms," adding, "this is a bit of a gray area of the law in Kansas."

The statute of limitations issue returned when the defendants moved for summary judgment. This time the district court concluded Unruh's lawsuit sounded in common-law civil battery and was time barred. The court relied on *Estate of Randolph v. City of Wichita*, 57 Kan. App. 2d 686, 459 P.3d 802 (2020), to conclude the officers' intentional use of force could not be framed as negligence. It acknowledged the *Randolph* decision

6

said a person injured by police officers' use of force might claim negligence in some cases, but concluded Unruh's allegations did not present those circumstances. It dismissed the remaining defendants, holding the same one-year limitations period barred his derivative claims against the police chief and the city.

Unruh appealed to the Court of Appeals, but the panel rejected his challenge. *Unruh*, 2022 WL 2392657, at *2-11. In doing so, the panel remarked, "Kansas courts should not recognize a tort of negligent use of excessive force." 2022 WL 2392657, at *8. Unruh then asked this court for review, stating his only issue as, "Does Kansas law recognize a claim of negligent use of force by a police officer?" The problem with this less-than-precise issue framing, of course, is that facts and their context typically alter the legal questions that need answering, so it is not as simple as Unruh portrays it.

We also note Unruh fails in his appellate briefing to identify specific Wichita police department policies he claims created a duty owed to him that the arresting officers violated. This shortcoming creates problems because it is not for us to connect those dots. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) ("Where the appellant fails to brief an issue, that issue is waived or abandoned."). Similarly, Unruh gives us no explanation about contradictory references in his briefing on whether officers deployed the canine, or it engaged without prompt. Again, this is not for us to figure out, so we are left with his assertion that a police officer owes a legally recognized duty that is actionable in negligence anytime there is an "affirmative act" by the officer causing injury.

Our jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

7

ANALYSIS

Unruh must distinguish his cause of action from battery to avoid its shorter statute of limitations, and he is not the first to face that predicament. See, e.g., *Murray v. Modoc State Bank*, 181 Kan. 642, 647-49, 313 P.2d 304 (1957) (liberally construing petition as an action against employer for negligent hiring and retention of employee with propensities towards violence who struck plaintiff and threw him to the ground); *Hershey v. Peake*, 115 Kan. 562, 565-67, 223 P. 1113 (1924) (construing claim that dentist pulled a healthy tooth as malpractice rather than assault and battery). But Unruh's problem is that the officers' decision to use force was "part and parcel of [their] intent to inflict harmful or offensive contact," which standing alone does not create an applicable duty. See *Ryan v. Napier*, 245 Ariz. 54, 61, 425 P.3d 230 (2018). As the court in *District of Columbia v. Chinn*, 839 A.2d 701, 707 (2003), explained:

> "What is required to justify [a negligence] instruction is at least one distinct element, *involving an independent breach of a standard of care beyond that of not using excessive force in making an arrest*, which may properly be analyzed and considered by the jury on its own terms apart from the intentional tort of battery and the defense of privilege." (Emphasis added.)

Unruh focuses on what he claims is the officers' flawed evaluation regarding the appropriate degree of nonlethal force needed to subdue him because he says he did not pose a threat to anyone. Acknowledging the officers acted intentionally, he characterizes their decision to use force as negligent. His "use of force" expert testified the officers should not have considered Unruh hostile while he was on the ground outside the car, explaining: "It was very evident that [Unruh] was scooping up the methamphetamine and it was so illuminated by the headlights that there was obviously no sign of any type of

8

firearm or weapon or anything of that nature. It's very evident through the video that Mr. Unruh was more concerned about collecting the narcotics than he is anything else."

For their part, the officers emphasize they applied force purposefully and intentionally to make a lawful felony arrest. In his affidavit, Weidner testified he knew during the chase Unruh was a member of "a violent group that moved large amounts of meth and was often armed." He said that when "[he] saw Unruh climbing out of his car through the driver's window," "Unruh had something in his hands." He "feared Unruh may have dropped a weapon and, because he was not trying to run away and was not immediately surrendering, [he] was afraid Unruh could be trying to arm himself and could then present a risk of harm [to] himself or other officers." Weidner said he intentionally sent his canine to apprehend Unruh when he saw that "Unruh continued to reach to the underside of the car, causing [him] to fear Unruh was armed or trying to reach for a weapon." Weidner conceded his physical contact with Unruh was "intentional, intended to gain compliance." Likewise, Pearce explained his "physical contact with Jason Unruh was intentional, intended to gain compliance, effect an arrest, and to protect [himself] and other officers."

Unruh describes his claim for "negligent use of force" by the officers as a tort centered at all times on the reasonableness of their determination to use force, applicable anytime "there is an affirmative act by the officer causing injury." And he insists the lower courts' rulings categorically abolish any "negligent use of force" claim against police officers. But we do not read their decisions the same way. In fact, both courts agreed "in *some* circumstances" one might be able to bring a negligence claim for injuries when a law enforcement officer makes intentional physical contact. See *Unruh*, 2022 WL 2392657, at *8. The difference, they explain, is that Unruh's claims rest entirely within the elements of common-law battery and do not articulate a legally recognized duty

separate from the officers' application of force with the admitted intent to cause harmful or offensive contact.

The analytical path presented here is not new, although it is confused by judicial dictum from *Dauffenbach v. City of Wichita*, 233 Kan. 1028, 1033, 667 P.2d 380 (1983), suggesting a special duty arises *anytime* "there is an affirmative act by the officer causing injury." But as we explain below, this phrasing oversimplifies how a law enforcement officer might be subject to a special duty of care with an individual member of the public.

*Standard of review*

The district court decided this case on summary judgment, so the legal standard for our review is no surprise:

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case.'" *Schreiner v. Hodge*, 315 Kan. 25, 30, 504 P.3d 410 (2022).

Appellate courts apply the same rules. And if the reviewing court determines reasonable minds could differ as to the conclusions to be drawn from the evidence, it must deny summary judgment. *Schreiner*, 315 Kan. at 30. Here, the essential facts are uncontroverted on the issue subject to our review.

*Discussion*

Some of our earliest caselaw considered the line between civil battery and negligence, although the language used to explain the ruling was fairly terse in reaching a result. For example, in *Laurent v. Bernier*, 1 Kan. 428, 431-32, 1863 WL 306 (1863), the court decided a claim for accidental discharge of a gun was barred by the one-year statute of limitations for civil battery. Citing old English caselaw, the *Laurent* court simply held the injury alleged "may properly be described as a battery." 1 Kan. at 432.

Forty years later, the court similarly held a damages action for an officer's careless shooting of the plaintiff was for battery. *Byrum v. Edwards*, 66 Kan. 96, Syl., 71 P. 250 (1903) ("An action to recover damages for carelessly or negligently shooting another is an action for a battery and is barred in one year."). In *Byrum*, both the plaintiff and an undersheriff searched for a robbery suspect. When the two crossed paths, they mistakenly thought the other was the robber and opened fire. The undersheriff hit the plaintiff, who sued alleging a negligent shooting because the undersheriff incorrectly thought he was the robber. The *Byrum* court, citing *Laurent* as its analog, held the one-year limitations period for battery barred the action. 66 Kan. at 97. Three decades after that, the court described *Byrum* as articulating that one factor differentiating battery from negligence is the defendant's intent to cause a harmful contact. *Hackenberger v. Travelers Mutual Cas. Co.*, 144 Kan. 607, 609, 62 P.2d 545 (1936) ("It is well to note the shooting in the Byrum Case was in fact intentional. The undersheriff intended to shoot and he did shoot. True, the injured party was not the robber as the undersheriff thought, but the act of shooting was nevertheless intentional.").

These cases returned to the court's attention in *Baska v. Scherzer*, 283 Kan. 750, 756-57, 156 P.3d 617 (2007), in which the plaintiff sued for negligence for injuries

11

suffered when she tried to stop a fight between the two defendants, who mistakenly hit her while scuffling with each other. She sued more than a year later, which presented a statute of limitations concern. The *Baska* court observed that simply labeling the claim as an action for negligence could not alter its underlying nature. 283 Kan. at 764-66.

The *Baska* court held the plaintiff's lawsuit fell outside the applicable one-year statute of limitations because the claim's substance could only be for intentional acts to cause harm. It reasoned the evidence showed both defendants intended to hit one another, but missed, so the tort claim was for assault and battery under the transferred-intent doctrine, even though any harm to her was unintentional. It summarized its holding as:

> "The defendants' acts of throwing punches in this case were intentional actions. Each defendant intended to strike at the other in order to cause harm. The defendants intended to punch, and they did punch. The fact that the punches in question hit the plaintiff rather than the defendants is immaterial to the analysis. Because the defendants' actions were intentional, the 'substance' of Baska's action is one for assault and battery. Failure to initiate her action within 1 year of the fight bars her action by reason of the 1-year statute of limitations in K.S.A. 60-514(b)." 283 Kan. at 764.

The *Unruh* panel relied on this line of cases, from *Laurent* through *Baska*, to construe the cause of action here as common-law civil battery. See *Unruh*, 2022 WL 2392657, at *3-4 (citing *Baska* to characterize Unruh's claim). But these earlier cases, as exemplified by *Baska*'s reasoning, seem to oversimplify the distinction between common-law battery and common-law negligence by viewing it from a rudimentary intentional vs. unintentional perspective. *Baska*, 283 Kan. at 756 (describing negligence as an unintentional breach of a legal duty causing damage reasonably foreseeable without which breach the damage would not have occurred); see also 283 Kan. at 764 (describing

12

the lower court's ruling in *Baska* as "contrary to the law of Kansas expressed in *Laurent*, *Byrum*, and *Hackenberger*"). There is more to it than that.

To explain, consider *Hershey* in which a dentist mistakenly extracted the wrong tooth. 115 Kan. at 563-67. The *Hershey* court recognized a valid negligence claim, despite the dentist's intentional act of pulling the tooth, because the dentist failed to exercise the ordinary care and skill owed to a patient when deciding which tooth to pull. 115 Kan. at 565. The *Hershey* court's differentiation between civil battery and negligence more precisely recognizes the two torts as distinct legal constructs with different elements. Compare *McElhaney*, 307 Kan. 45, Syl. ¶ 1 (defining civil battery as "the unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact . . . that is harmful or offensive"), with *Reardon*, 310 Kan. at 903 (defining the elements of negligence as: "[1] defendant owed a duty to the plaintiff; [2] defendant breached that duty; [3] plaintiff's injuries were caused by the defendant's breach; and [4] plaintiff suffered damages").

As Dobbs' Law of Torts instructs:

"Intent and negligence are entirely different concepts. Negligence entails unreasonably risky conduct; the emphasis is on risk as it would be perceived by a reasonable person, not on the defendant's purpose or on the certainty required to show intent. . . . Indeed, negligence does not require a state of mind at all but focuses instead on outward conduct. Even if the defendant recognizes the risk and deliberately decides to chance it without having purpose or certainty required for intent, he is not liable for an intentional tort, only for negligence." Dobbs, The Law of Torts § 31 (2d ed.).

The difference then is not whether the act itself was intentional or accidental; rather, it is whether a claim meets the separate elements of the different causes of action.

13

Battery asks whether the actor intentionally caused contact with the intent to injure. See *McElhaney*, 307 Kan. at 53 (noting the "intent to injure" element of civil battery can be satisfied in alternative ways—either by an intent to cause a harmful bodily contact or by an intent to cause an offensive bodily contact). In contrast, negligence asks whether the actor's action, regardless of mental state, e.g., innocent, intentional, or accidental, breached an applicable duty of care that caused harm. These distinctions cannot be accurately captured in shorthand phrasing like intentional vs. unintentional—the two torts are discrete causes of action.

Unruh argues his claim meets the required elements for negligence, such that it establishes both duty and breach—specifically, he argues the officers owed him a duty to not use excessive force when arresting him and breached that duty by negligently misperceiving the degree of physical force necessary under the circumstances. But that conflates the analytical process. Our first step in any negligence analysis is identifying the duty owed by the defendant to the plaintiff because only then can one examine sequentially the remaining three elements—i.e., breach, causation, and damages.

Broadly speaking, police officers have a general duty to prevent crime and enforce laws. *Hopkins v. State*, 237 Kan. 601, 611, 702 P.2d 311 (1985) ("[T]he duty of a law enforcement officer to preserve the peace is a duty owed to the public at large. Absent some special relationship with or specific duty owed an individual, liability will not lie for damages."); *Dauffenbach*, 233 Kan. at 1033; *Montgomery v. Saleh*, 311 Kan. 649, 653, 466 P.3d 902 (2020). And when acting within the scope of their general duty, officers have immunity. K.S.A. 75-6104(c). This includes the privileged use of force to make a lawful arrest. K.S.A. 2022 Supp. 21-5227(a). But, despite this, liability in negligence may arise when an officer breaches a specific or special duty owed to an

individual. The challenge is determining when an officer's general duty to the public narrows to a special duty to the individual.

In Kansas, *Dauffenbach* shortcuts the first step (identifying the applicable duty) in the negligence analysis. Its questionable passage states:

> "Police officers have immunity from liability on claims arising from performance or nonperformance of an officer's general duties to prevent crime and enforce the laws. Liability arises only where an officer breaches a specific or special duty owed an individual. *Such a special duty arises in two circumstances: (1) where there is an affirmative act by the officer causing injury*; and (2) when a specific promise or representation by the officer is made under circumstances creating justifiable reliance. *McGeorge v. City of Phoenix*, 117 Ariz. 272, 572 P.2d 100 (1977); *Doe v. Hendricks*, 92 N.M. 499, 590 P.2d 647 (1979). Examples of situations within the first category are placing an individual under arrest or committing an assault. A line of Kansas cases which recognize that an officer is liable for false arrest or the unnecessary use of force lends support to the existence of a special duty arising from such affirmative acts. *Bradford v. Mahan*, 219 Kan. 450, 548 P.2d 1223 (1976); *Gardner v. McDowell*, 202 Kan. 705, 451 P.2d 501 (1969); *Bukaty v. Berglund*, 179 Kan. 259, 294 P.2d 228 (1956)." (Emphasis added.) *Dauffenbach*, 233 Kan. at 1033.

Some courts have referenced the italicized language to justify imposing a special duty on law enforcement, looking no further than simply deciding whether the officer acted affirmatively. See, e.g., *McHenry v. City of Ottawa*, No. 16-2736-DDC-JPO, 2017 WL 4269903, at *14 (D. Kan. 2017) (unpublished opinion) (characterizing officers' shooting of plaintiff as a potential affirmative act); *Richards v. City of Wichita*, No. 15-1279-EFM-KGG, 2016 WL 5341756, at *8 (D. Kan. 2016) (unpublished opinion) (describing officer's entry into plaintiff's home as an affirmative act); and *Price v. City of Wichita*, No. 12-1432-CM, 2013 WL 6081103, at *4 (D. Kan. 2013) (unpublished

15

opinion) (stating officer affirmatively acted by stomping on plaintiff's leg). The problem with this from a tort law perspective, of course, is that almost all acts can be characterized as affirmative ones. See Black's Law Dictionary 73 (11th ed. 2019) (defining "affirmative" as meaning "[i]nvolving or requiring effort").

It seems obvious more is needed when imposing a special duty on law enforcement than just deciding if an officer's affirmative act caused an injury. After all, most anything requires exertion, and the separate tort of common-law battery would be swallowed whole by a negligence framing such as this. *Dauffenbach* cannot be reduced to such simplistic shorthand, and the caselaw cited by the *Dauffenbach* court in support of this dubious passage shows something else is required.

Look first at *McGeorge*, an Arizona Court of Appeals decision holding a police officer did not owe a special duty for failing to prevent an irate person from shooting the deceased based solely on the officer's encounter with the killer just 15 minutes earlier. *McGeorge*, 117 Ariz. at 274-75, 277. It reasoned, "[W]e do not think that any duty [the officer] owed to the public generally had narrowed so as to create a duty toward [the deceased]." 117 Ariz. at 277. In citing examples of what would constitute an affirmative act creating a special duty, the *McGeorge* court referenced scenarios such as police taking an assault victim to identify the attackers, one of whom got loose and hurt the victim; a city sewer inspector directing someone to climb into an open trench that collapsed and killed him; and a fire department ordering a company to use carbon dioxide on a damaged ship as a preventative that caused an explosion destroying the ship. 117 Ariz. at 277.

Now consider *Hendricks*, also cited by the *Dauffenbach* court, in which the New Mexico Court of Appeals held no special relationship existed to give rise to a special duty

16

between a sexual assault victim and a police chief, who did not immediately respond to a telephoned tip that the victim had been abducted and was being held in a house. In so holding, it listed the same three examples as the *McGeorge* court from Arizona. *Hendricks*, 92 N.M. at 503.

The circumstances listed in *McGeorge* and *Hendricks* are decidedly different from those asserted by Unruh because they are independent of an officer's use of force. As the *Unruh* panel observed, neither case "provide[s] that the affirmative act giving rise to the duty can be the same act that breaches the duty." *Unruh*, 2022 WL 2392657, at *9. Unruh's claim does not square with these cases' reasoning, as it starts and stops with the officers' use of force.

Similarly, the three Kansas cases referenced in *Dauffenbach* do not fit Unruh's procedural posture or his factual scenario. Both *Bradford* and *Gardner* held the district court erred in granting a motion to dismiss. In *Bradford*, a defamation claim, the allegations were sufficient to entitle the plaintiff to proceed. *Bradford*, 219 Kan. at 454. And the *Gardner* court reversed a district court's granting a motion to dismiss, stating: "It is alleged they used unlawful and unnecessary force to apprehend the decedent in that they carelessly, negligently, wilfully and wantonly shot the decedent at point blank range of less than five feet"; and "[u]nder the posture of the case as it comes to us *we are not at liberty to consider facts alleged by the officers in the answer*." (Emphasis added.) *Gardner*, 202 Kan. at 711.

Obviously, surviving a motion to dismiss requires less than a motion for summary judgment, as the plaintiff must come forward with facts to demonstrate the claims made to avoid summary judgment. Compare *Sperry v. McKune*, 305 Kan. 469, 480, 384 P.3d 1003 (2016) (stating "a district court, when considering . . . a motion [to dismiss for a

17

failure to state a claim], must decide it 'from the well-pleaded facts of plaintiff's petition'"), with K.S.A. 2022 Supp. 60-256(c)(2) (stating the "judgment sought should be rendered if" evidence shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"); *First Security Bank v. Buehne*, 314 Kan. 507, 510, 501 P.3d 362 (2021) (noting when "'opposing a motion for summary judgment, an adverse party must come forward with evidence'"). And recall in Unruh's case, the district court initially denied the defendants' motion to dismiss the petition before discovery, showing the court recognized the procedural posture at that time. Neither *Bradford* nor *Gardner* help Unruh's argument.

In *Bukaty*, the third and final Kansas case cited by *Dauffenbach*, a mentally ill man was jailed for his own protection and later died after officers injected sulfur dioxide gas into his jail cell to subdue him. The district court granted judgment for the defendants at the close of plaintiff's trial evidence. On appeal, the *Bukaty* court reversed and held "it is not a question of the officers having a right to subdue [the man.] The question is whether the use of such a deadly gas was reasonably necessary under all the surrounding facts and circumstances." *Bukaty*, 179 Kan. at 268. The *Bukaty* court then provided this more detailed explanation for its ruling, which underscores the profound differences between its facts, the legal duties separately imposed on the jailers, and Unruh's circumstances:

> "[W]e have a story of a colored man picked up by an officer under circumstances from which an inference might be drawn that he was at least mentally disturbed. He was taken to the jail as seemed was proper under the circumstances; that he created a disturbance in the jail there can be no doubt; the sheriff as keeper of the jail had a duty under all the surrounding facts and circumstances. Just what his duty was we need not answer. Apparently the officers present had in mind causing him to leave the cell block since that is the usual function of tear gas. It temporarily blinds the one against whom it is used so he may be more easily subdued once he is in the open. This did not work on account of the windows Bush broke out, thus enabling him to get some fresh air.

18

"Then the deadly sulfur dioxide was used. A reasonable inference is, the purpose of using this gas was to render Bush unconscious, since an officer was detailed to watch him, and come around and tell the officers feeding the gas into the jail when he had 'keeled over.' The drum in which the gas was contained had the label 'sulfa dioxide' on it. There was evidence that one of the defendants called a doctor and asked him about the use of 'refrigerator gas.' There was nothing in the record that anything was said about 'sulfa dioxide' although the drum was so labeled. There is evidence that the man who furnished the gas advised the officers to call a doctor but none was called until Bush was dragged from the jail. There was substantial testimony by a doctor as to the deadly nature of sulfuric acid, which is formed when sulfur dioxide is exposed to the air and comes in contact with moisture in the lungs.

"The statute makes it the duty of the sheriff to treat all prisoners with humanity. See, G.S.1949, 19-1919. It also makes him the keeper of the jail. See, G.S.1949, 19-1903 and G.S.1949, 19-811." 179 Kan. at 266-67.

The *Bukaty* wrongful death claim arose from specific statutory duties, independent of some generic duty to not use excessive force, owed to those already in custody, and constituting a breach, i.e., the gas. Those duties and the surrounding circumstances could be considered by a fact-finder separately from any claim of intentional civil battery. But Unruh's claim cannot, so *Bukaty* also does not advance Unruh's case.

The point to all this is simply to explain *Dauffenbach* should not be literally read to mean a special duty cognizable in negligence is owed *anytime* a police officer affirmatively acts and causes injury. The caselaw the *Dauffenbach* court cites contextualizes its language to require something more is necessary to constitute an actionable negligence claim. Otherwise, a claim for negligent excessive force, without a special duty independent of the force itself, simply transforms civil battery into negligence, merging distinct legal concepts into one.

19

Unruh counters that *Dauffenbach* would have been decided differently if negligence was never allowed in excessive force cases. But that misses the point. *Dauffenbach* answered a specific question about the proper burden to overcome a statutory presumption—not how to categorize the claimed cause of action under the facts presented. *Dauffenbach*, 233 Kan. at 1035 ("The key question is whether to continue following the preponderance of evidence standard applied to negligence and tort actions or adopt, as the trial court did, a clear and convincing standard in determining whether the police officers breached a duty."). It should not be read more broadly than the question presented and the caselaw cited to support what it says. Any reading of *Dauffenbach* suggesting a police officer owes a special duty anytime there is an affirmative act by the officer causing injury is disapproved.

Similarly, prior cases construing *Dauffenbach*'s language that did not grapple with the caselaw it cites cannot remain on firm ground. See, e.g., *Price*, 2013 WL 6081103, at *2 (permitting plaintiff to proceed with a negligent excessive force claim at the motion to dismiss stage after defendants argued it was a time barred battery claim). *Price* did not convince the *Unruh* panel, and it similarly does not convince us.

As the *Unruh* panel explained,

"The *Price* court did not investigate the meaning of the term 'affirmative act' as used in *Dauffenbach*. The *Dauffenbach* court cited two out of state cases—*McGeorge v. City of Phoenix*, 117 Ariz. 272, 572 P.2d 100 (1977), and *Doe v. Hendricks*, 92 N.M. 499, 590 P.2d 647 (1979)—for the proposition that a special duty may arise when there is an affirmative act by the officer causing injury. Neither of these cases provide that the affirmative act giving rise to the duty can be the same act that breaches the duty." *Unruh*, 2022 WL 2392657, at *9.

20

Unruh also argues a police officer's misperception forms a basis for breach of a special duty in tort, but that rationale exemplifies the problem of using misperception without an accompanying special duty. Generally, one's misperception, misjudgment, or misappraisal alone does not provide grounds for negligence. See Restatement (Second) of Torts § 284 (1965) (stating a negligence claim requires either "an act" or "a failure to do an act"); *Ryan*, 245 Ariz. at 61 ("An actor's internal evaluation about whether to use force and the decision to do so are not 'acts' and therefore cannot, by themselves, constitute negligence."). An actor's judgment about whether to use intentional force should be considered part of their intent to inflict harmful or offensive contact. See *McElhaney*, 307 Kan. at 53 (defining battery).

*Estate of Randolph v. City of Wichita*, 57 Kan. App. 2d 686, 459 P.3d 802 (2020), seemingly addresses such a misperception-as-breach argument. In that case, an estate sued police officers for "[n]egligent use of force" alleging the officer incorrectly judged the need to deploy a Taser and then a firearm against a mentally ill person approaching with a knife with a four-inch blade. 57 Kan. App. 2d at 694. The allegation focused on whether the officer correctly perceived whether the deceased was trying to stab him or was just holding the knife. 57 Kan. App. 2d at 692-93. But the *Randolph* panel held that regardless of the answer to that disagreement, the estate's claim could *only* be a common-law civil battery without a special duty breached by the intentional act. It explained:

> "[The officer]'s use of force, particularly the fatal shooting of Randolph, virtually defines
> a civil battery if not otherwise privileged. [The officer] deliberately fired four shots at
> Randolph's torso—an intentional application of deadly force. The shooting was not the
> product of negligence or carelessness, and [the officer] understood the likely consequence
> of his conduct was a grave or fatal injury to Randolph. Liability, therefore, turns on [the
> officer]'s entitlement to a self-defense privilege. *The shooting was either a privileged use*

*of force or it was an actionable battery.* The same analysis and result controls [the officer]'s use of the Taser whether the estate treats it as a distinct claim for negligent use of force or as a component of a single claim combined with the shooting." (Emphasis added.) 57 Kan. App. 2d at 714.

We see no factual distinction between *Randolph* and Unruh's claim. The legal inquiry is certainly the same, i.e., whether there was an independent special duty breached by the officers' intentional acts. The *Unruh* panel observed:

"While Unruh's appellate brief creatively tries to make a distinction and argue that there was a separate negligent act, as we read the facts here it appears to us that in reality the officers' decision to continue the encounter in a violent way was merely a decision to use intentional force. Thus, we do not discern any negligent act which was separate from and preceding the application of force, and Unruh does not assert that the officers breached a standard of care beyond that of not using excessive force. For these reasons, this case is like *Estate of Randolph*, and the district court properly construed Unruh's claim as a claim for battery." *Unruh*, 2022 WL 2392657, at *8.

This is not to say, of course, that in some situations an actor's negligent evaluation cannot serve as the foundation for a negligence claim. See, e.g., *Smith v. Welch*, 265 Kan. 868, 881, 967 P.2d 727 (1998) (holding a "physician is obligated to his or her patient to use . . . his or her best judgment" in providing patient care). But here, Unruh falls short in demonstrating any separate and discernible duty beyond not committing the tort of battery as a basis for actionable negligence under the circumstances presented.

Finally, Unruh cites *Beltran-Serrano v. City of Tacoma*, 193 Wash. 2d 537, 442 P.3d 608 (2019), but he is mistaken in believing it helps support his theory. In fact, *Beltran-Serrano* exemplifies the rule we have explained that a police officer may create a legally recognized duty during an encounter, independent of the mere use of force. There,

22

a mentally ill homeless man sued for negligence after a police officer shot him multiple times. The plaintiff argued the officer "unreasonably failed to follow police practices calculated to avoid the use of deadly force," which included the officer's "failure to respond appropriately to clear signs of mental illness or impairment, her decision to continue to engage with [him] in English, and her decision to prevent him from walking away." 193 Wash. 2d at 544. In making these arguments, the plaintiff identified the potential negligence in the officer's actions occurring before the decision to shoot. On appeal, the *Beltran-Serrano* court held the fact the officer's shooting "may constitute assault and battery does not preclude a negligence claim *premised on her alleged failure to use ordinary care to avoid unreasonably escalating the encounter to the use of deadly force*." (Emphasis added.) 193 Wash. 2d at 540. But in so deciding, it explained the negligence claim arose from the officer's interactions with the plaintiff before things deteriorated to the use of deadly force and that those interactions created a "specific tort duty" for the officer to exercise reasonable care. 193 Wash. 2d at 552.

Unlike the *Beltran-Serrano* plaintiff, Unruh fails to support his negligence theory separate and apart from the officers' application of force—something the *Unruh* panel highlighted. *Unruh*, 2022 WL 2392657, at *6. And as the *Chinn* court emphasized, "one incident may give rise to both negligence and intentional tort claims *but . . . plaintiffs must set forth theories meeting the individual requirements of each claim*." (Emphasis added.) *Chinn*, 839 A.2d at 708.

Ultimately, the *Unruh* panel concluded:

"These examples [from *McGeorge* and *Hendricks*] all involve an affirmative act
that established a duty independent of the act that harmed the plaintiff. These examples of
affirmative acts giving rise to a special duty do not support the argument that an officer's
intentional injury of a person gives rise to a special duty, actionable in negligence, not to

23

use excessive force in intentionally injuring that person. . . . It is also consistent with the suggestions in *Chinn* and *Ryan* that a negligent act must precede the use of force. *Chinn*, 839 A.2d at 711; *Ryan*, 245 Ariz. at 62. For these reasons, we will adhere to the reasoning in *Estate of Randolph* rather than the *Price* court's contrary conclusion." *Unruh*, 2022 WL 2392657, at *10.

We agree and note the *Ryan* court succinctly stated the principle: "Plaintiffs may plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory," but they "cannot assert a negligence claim based *solely* on an officer's intentional use of physical force." (Emphasis added.) *Ryan*, 245 Ariz. at 57, 62.

## CONCLUSION

While it might be possible in some circumstances to have a distinct act of negligence arise during an incident involving excessive police force when making a lawful felony arrest, negligence requires establishing a separate duty owed to an individual beyond the intentional force applied. Unruh's dispute goes to civil battery's privilege element, which in this instance is tied to a statute. See K.S.A. 2022 Supp. 21-5227(a). Unruh fails to "come forward with evidence to establish a dispute as to a material fact," i.e., the arresting officers' conduct creating a special duty to Unruh other than not allegedly applying excessive force. See *Schreiner v. Hodge*, 315 Kan. 25, 30, 504 P.3d 410 (2022). The panel correctly upheld the district court's grant of the defendants' summary judgment motion.

Judgment of the Court of Appeals affirming the district court is affirmed on the issue subject to review. Judgment of the district court is affirmed on the issue subject to review.